UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- X
                                     :

CALA ROSA MARINE CO. LTD.,       :

                              :

               Plaintiff,       :

                              :

         - against -          :

                              :

SUCRES ET DENERES GROUP a/k/a   :
SUCDEN MIDDLE EAST PART OF     :
SUCRES ET DENREES GROUP and    :
SUCDEN MIDDLE EAST a/k/a       :
SUCDEN MIDDLE EAST PART OF     :
SUCRES ET DENREES GROUP,       :

                              :

             Defendants.    :

-------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/4/09

## OPINION AND ORDER

09 Civ. 425 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

On January 15, 2008, Cala Rosa Marine Co. Ltd. ("Cala Rosa" or "plaintiff") commenced this action and requested an ex parte order directing attachment and garnishment ("Attachment Order") of up to $889,463.59 of the assets of Sucden Middle East Part of Sucres Et Denres Group ("Sucden" or "defendant") and affiliated companies.  Plaintiff requests this Court to order that any process served on a garnishee shall be deemed continuously served through the end of the next business day.  Plaintiff further requests this Court to appoint a

1

special process server, designated by plaintiff, to serve the process. The request for a maritime attachment order is granted but, for the reasons stated below, the requests for continuous service and a specially appointed process server are denied.

## II.   BACKGROUND

### A.   The 2004 Memorandum of Agreement and Subsequent Arbitration

On September 22, 2008, Cala Rosa, as owner of a vessel, and Sucden, as charterer, executed a Charter Party Agreement ("Charter Party") for the carriage of a cargo of sugar from Brazil to Algeria. Under the terms of the Charter Party, defendant was responsible for the pre-loading condition of the cargo and any inherent defect in the cargo. The Algerian cargo receivers claimed that the sugar was delivered to the Algerian port in a damaged condition and required plaintiff to post security in the amount of $284,977 to secure this claim.[1] Further, plaintiff alleges that defendant failed to pay $380,864.63 in freight and demurrage costs.

---

[1]    After this Court informed plaintiff that its original complaint did not meet the heightened pleading requirements in Supplemental Rule E(2)(a), plaintiff submitted a supplemental affidavit, with exhibits, alleging that some of the cargo was spoiled before it was placed on the ship and some of the sound cargo was destroyed when the spoiled cargo was jettisoned at sea. *See* 1/21/09 Supplemental Affidavit of Garth S. Wolfson, counsel for plaintiff, in Support of Plaintiff's Prayer for an Order of Attachment and Garnishment.

2

Plaintiff alleges that defendant is liable to plaintiff for all these sums.

The Charter Party contains a clause mandating London arbitration for all claims arising under the Charter Party, and plaintiff has commenced London arbitration.[2] On January 15, 2009, plaintiff commenced this action under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("REFAA"), 9 U.S.C. §§ 201-209, which permits attachment in actions that seek to enforce foreign arbitral awards.[3]  Including estimated attorneys' fees and costs, plaintiff seeks an attachment in the amount of $889,463.59.

Plaintiff seeks, inter alia, to attach Electronic Funds Transfers ("EFTs") as they pass through New York banks.[4]  Plaintiff alleges "on information and belief [that] defendants have or will have during the pendency of this action" assets in the hands of the garnishee banks.[5]

In the affidavit in support of attachment, plaintiff requests that the

---

[2]     See Complaint ("Compl.") ¶ 24.

[3]     See, e.g., Atlas Chartering Servs., Inc. v. World Trade Grp., Inc., 453 F. Supp. 861, 863 (S.D.N.Y. 1978).

[4]     See Compl. ¶ 30.

[5]     Id. ¶ 29.

Attachment Order contain two special provisions.[6]  *First*, plaintiff requests that the

Attachment Order contain a provision for continuous service.  Plaintiff explains:

> In order to avoid the necessity of physically serving the garnishees/banks daily and repetitively, plaintiff respectfully seeks leave of the Court, for any process that is served on a garnishee to be deemed effective and continuous service throughout the remainder of the day upon which service is made, commencing from the time of such service and such service to be further deemed effective and continuous through the end of the next business day, provided that another service is made that day.[7]

*Second*, plaintiff requests that the Court appoint a plaintiff-retained

special process server who, along with the United States Marshal, will be

authorized to serve the Attachment Order, as well as any supplemental process that

might issue, on the garnishees.  Plaintiff states that this is necessary because "daily

service of Rule B orders would impose upon the United States Marshal an

overwhelming burden and would cause to be visited on litigants . . .

disproportionate costs and inefficiency."[8]

## III.   LEGAL BACKGROUND

---

[6]     *See* Affidavit of Garth S. Wolfson in Support of Plaintiff's Prayer for an Order of Attachment and Garnishment.

[7]     *Id.* ¶ 12.

[8]     *Id.* ¶ 11.

## A.    Attaching After-Acquired Property

In *Reibor International Limited v. Cargo Carriers (KACZ-CO.)*
*Limited*, the Second Circuit considered whether a maritime plaintiff may attach
"after-acquired property" – i.e., property that was not in the hands of the garnishee
at the time the attachment order was served.[9]  In *Reibor*, plaintiff served an order
of maritime attachment on a garnishee bank at about 10:25 a.m., but the bank did
not receive the transferred funds until 2:21 p.m. that afternoon.[10]  The bank
attached the funds.  The district court vacated the attachment, holding that a
plaintiff may only attach funds that are in the hands of the garnishee at the time the
attachment order is served.[11]  The Second Circuit affirmed.  Addressing the
permissibility of attaching after-acquired property under Rule B, the court first
noted that

> The Admiralty Rules themselves offer little guidance. Rule
> B does not mention attachment of after-acquired property.
> Two other rules, Rule C and Rule E, appear to contemplate
> service on garnishees actually in possession of the property
> to be attached, but neither addresses the issue of
> after-acquired property directly.[12]

---

[9]     *See* 759 F.2d 262 (2d Cir. 1985).

[10]    *See id.* at 264.

[11]    *See id.* at 263.

[12]    *Id.* at 265.

Because federal case law also failed to provide guidance, the court adopted, under federal common law choice of law principles, the New York rule against attaching property not in the hands of the garnishee at the time of service. Quoting Judge Joseph McLaughlin's commentary on New York practice, the court found New York's law to be clear in this regard: "Where the order of attachment is left with a third-party garnishee . . . the levy is *absolutely void* unless the garnishee has some property belonging to the defendant or owes the defendant a debt *at the time the order is left with him*."[13]  The court decided to adopt the New York rule because "'a decision . . . contrary to the general rule of the state might have disruptive consequences for the state banking system'" and adopting state law "minimize[s] disruptive divergences between state and federal law."[14]

The court rejected Reibor's equitable argument against enforcing the New York rule in a case where the funds came into the garnishee bank mere hours after the attachment order was served.  In rejecting this argument, the court dryly noted that "the rule works, to be sure, to the detriment of an attaching creditor, but

---

[13]     *Id.* (quoting McLaughlin, Practice Commentary C6214:3) (emphases added).

[14]     *Id.* at 266 (quoting *Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50, 55-56 (2d Cir. 1965)).

that is simply the way the law was intended to operate."[15] Further, Reibor's proposed rule "could have considerable impact on international banking practices" and prove "extremely and unfairly taxing" on New York banks.[16]

In *ContiChem LPG v. Parsons Shipping Company, Limited*, the Second Circuit addressed whether a maritime plaintiff "could accomplish indirectly, by means of an order restraining to-be-attached property, that which it could not do directly in light of the well-established prohibition against maritime attachments of after-acquired property."[17] In an effort to circumvent *Reibor*'s prohibition on attaching after-acquired property, ContiChem obtained a temporary restraining order from the district court preventing the bank from releasing any funds belonging to the defendant that transferred through the bank.[18] Once EFTs were held pursuant to the restraining order, plaintiff served a maritime attachment order on the bank and attached the funds that were then in the hands of the garnishee bank.[19]

---

[15]     *Id.* at 268.

[16]     *Id.*

[17]     229 F.3d 426, 433 (2d Cir. 2000).

[18]     *See id.* at 429.

[19]     *See id.*

The district court first found that the restraining order was invalid under New York law and then vacated the Rule B attachment under *Reibor*.[20] The Second Circuit affirmed, holding that plaintiff "improperly attempted to circumvent the rule against attachment of property not yet in [the garnishee bank's hands]."[21]

In *Winter Storm Shipping Limited v. TPI*, the Second Circuit held that EFTs emanating from defendant's bank account are "property" belonging to defendant subject to attachment.[22] Upon receiving initial process of the attachment order, the garnishee bank decided, without a court order, to place a hold on any funds that transferred through the bank emanating from the defendant's accounts.[23] In this respect, the bank effectively treated the service of process of the attachment order as being continually served. Once the bank held defendant's EFTs, plaintiff served supplemental process of the Attachment Order while the funds were at the bank and attached the funds.[24] The fact that the

---

[20]    *See id.*

[21]    *Id.* at 434.

[22]    310 F.3d 263 (2d Cir. 2002).

[23]    *See id.* at 274 n.7.

[24]    *See id.*

8

attachment was served *while the funds were at the bank*, the Court held, placed the case outside the ambit of *Reibor*'s well-established rule against attachment of after-acquired property.[25] Further, the case did not fall within the ambit of *Contichem* because the bank made the unilateral decision to place a hold on future transfers and plaintiff's actions were, therefore, "entirely blameless."[26]

In recent years, many district courts have begun to issue attachment orders that direct the garnishee to treat the order as continuously served for a day. Given the *Reibor* prohibition on attachment of after-acquired property and given that "'[a]n EFT may be in the possession of a financial institution for only a very short period of time,' and may move through the bank 'almost instantaneously,' it follows that it would be virtually impossible for plaintiffs to attach EFTs unless garnishee banks are permitted to accept continuous service."[27] The continuous service provision is thus "intended to avoid 'the absurdity, security problems, and inconvenience of requiring the garnishee banks to accept service repeatedly

[25]     *See id.*

[26]     *Id.*

[27]     *DSND Subsea AS v. Oceanografia, S.A. de CV*, 569 F. Supp. 2d 339, 346-47 (S.D.N.Y. 2008) (quoting *Ullises Shipping Corp. v. FAL Shipping Co. Ltd.*, 415 F. Supp. 2d 318, 324 (S.D.N.Y. 2006), *overruled on other grounds by Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 446 (2d Cir. 2006)).

9

throughout the day.'"[28]  Indeed, "the absence of such a continuing service

provision – either by court order or by consent from the garnishee – would

inevitably result in the posting of lawyers and/or process servers at bank offices

around the clock in an attempt to capture EFTs at the precise moment of their

arrival."[29]

## IV.    LEGAL STANDARD

### A.    Continuous Service

Under Rule B of the Supplemental Admiralty Rules for Certain

Admiralty and Maritime Claims of the Federal Rules of Civil Procedure

("Supplemental Rules"), a "verified complaint may contain a prayer for process to

attach the defendant's tangible or intangible personal property — up to the amount

sued for — *in the hands of garnishees named in the process*."[30]  No provision in

the Supplemental Rules authorizes a court to issue an attachment order that

permits continuous service.  Equally, "'[n]othing in the Admiralty Rules prohibits

---

[28]    *Id.* at 347 (quoting *Ullises*, 415 F. Supp. 2d at 328).

[29]    *Id.*

[30]    Supplemental Rule B(1)(a) (emphasis added).

10

this Court from issuing such an order.'"[31]  Notwithstanding the "well-established

prohibition against maritime attachments of after-acquired property,"[32] every court

in this district to reach the issue has held that it is *permissible* for a court to issue

an order directing that service shall be deemed continuous for a day[33] and for a

garnishee, without a court order, to consent to treat service as continuous for a

day.[34]  However, no court has held that a district court *must* authorize continuous

service and there is no caselaw discussing the parameters of a court's discretion in

this regard.

## B.    Specially Appointed Process Server

Supplemental Rule B provides that when serving an attachment order

that authorizes the attachment of intangible property such as EFTs,

---

[31]    *DSND Subsea*, 569 F. Supp. 2d at 347 (quoting *Ullis*es, 415 F. Supp. 2d at 328).

[32]     *ContiChem*, 229 F.3d at 433.

[33]    *See DSND Subsea*, 569 F. Supp. 2d at 345-47.  *Accord Ullises*, 415 F. Supp. 2d at 328.

[34]    *See Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*, 485 F. Supp. 2d 399, 410 (S.D.N.Y. 2007) ("[P]laintiff may not *compel* a garnishee to hold service of process for maritime attachment effective until such time as a *res* comes into the garnishee's possession or the garnishee answers, but the garnishee may agree to do so, and the garnishee's procedures will not vitiate an attachment as long as they are reasonable.").  *Accord Ythan Ltd. v. Americas Bulk Transport Ltd.*, 336 F. Supp. 2d 305, 307 (S.D.N.Y. 2004).

> [T]he summons, process, and any supplemental process
> must be delivered to a person or organization authorized
> to serve it, who may be (A) a marshal; (B) someone
> under contract with the United States; [or] (C) someone
> specially appointed by the court for that purpose . . . .[35]

## V.    DISCUSSION

Although this Court is clearly permitted to include a continuous

service provision in the attachment order, it is not required to do so.  Because (1)

the Federal and Supplemental Rules make no provision for "continuous service,"

(2) the relatively recent innovation of authorizing continuous service circumvents

the *Reibor* prohibition against attaching after-acquired property, and (3) the

practice is disruptive to the New York banking industry and flouts the New York

rule that *Reibor* adopted, this Court declines to exercise its discretion to mandate

banks to treat the service as continuous.  If banks elect to treat the service as

continuous – as the bank did in *Winter Storm* – they may do so; and if funds are

subsequently attached, the overwhelming authority provides that no vacatur will

follow.  But absent the bank's consent, this Court no longer believes it is wise to

require New York banks to do what New York law does not require them to do.

This conclusion is buttressed by the relative lack of interest the

United States forum has in this dispute: there is no reason to believe that

---

[35]      Supplemental Rule B(1)(d)(ii).

12

defendant's property was in the United States at the time this motion was filed or will be in the United States before the arbitration is settled,[36] the merits of the dispute will be resolved in London arbitration according to foreign law and pursuant to a mandatory foreign arbitration clause, the operative facts all occurred abroad, and the parties have no discernable ties to the United States. In light of this forum's very slight interest in the dispute, there is little reason to impose enormous strains on the New York banking system[37] and to create disparities

---

[36]    Indeed, plaintiff alleges only, on information and belief, that the *res* is or *will be* in the district during the pendency of this action. Because this action is brought to enforce the London arbitration award and because, according to *plaintiff's* estimate, the arbitration will last two years, *see* Compl. ¶ 26 (calculating attorneys' fees based on two years of London arbitration), it follows that plaintiff is simply alleging that defendant's funds will be in the district sometime during the next two years.

[37]    *Reibor* recognized that requiring banks to attach after-acquired EFTs "could have considerable impact on international banking practices" and prove "extremely and unfairly taxing" on New York banks. 759 F.2d 268. In an amicus brief filed by an association of New York banks in *Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104, (2d Cir. 2008), the banks explained the nature of these burdens, which have increased greatly in recent years. New York banks handle a large portion of all international funds transfers. *See* Brief for *Amicus Curiae* The Clearing House Association L.L.C. in Support of Defendant-appellant, at 10-11 (noting that as of June 29, 2007, "*daily* volumes of all funds transfers passing through, or ending in, New York average over \$4.2 trillion" and that the main electronic funds transfer system "processes over 330,000 payment orders" per day) (emphasis added)). As of August 2, 2007, several major New York banks were receiving over 100 attachment orders per day, seeking attachment of millions of dollars. *Id.* at 7. This Court was recently informed that, currently, leading New York banks receive numerous new

13

between New York and federal law.

Moreover, because plaintiff alleges only that defendant's funds will be in the district sometime during the next two years — confirming this Court's experience that many attachment orders are continually re-served over a period of many months — a continuous service provision may cause a lasting burden on New York banks in circumstances where the plaintiff has little reason to be assured of any success in attaching the funds in the near future (if at all). Finally, if deference is to be paid to the forum most interested in the dispute — the arbitration body in London — there is no strong interest in attaching the funds because London does not permit pre-arbitration attachment. Supplemental Rule B

---

attachment orders and over 700 supplemental services of existing orders *each day*. This is confirmed by the striking surge in maritime attachment requests in this district, which now comprise approximately one third of all cases filed in the Southern District of New York. As a consequence, New York banks have hired additional staff, and suffer considerable expenses, to process the attachments. *See id.* at 8 (noting that each attachment requires banks to amend "their software screens that list entities and other persons whose financial transactions must be blocked by banks"). The sheer volume of amendments to the software screens leads to many false "hits" of funds subject to attachment, which has allegedly introduced significant uncertainty into the international funds transfer process. *See id.* at 8, 12. Finally, banks are understandably loath to be placed in the middle of international civil disputes with which they have no connection. *See id.* at 5; *see also Grain Traders, Inc.* v. *Citibank, N.A.*, 160 F.3d 97, 102 (2d Cir. 1998) ("These are matters as to which an intermediary bank ordinarily should not have to be concerned and, if it were otherwise, would impede the use of rapid electronic funds transfers in commerce by causing delays and driving up costs.").

14

confirms this conclusion, in that it contemplates that attachment orders will be served only to acquire property "in the hands of garnishees named in the process."[38]

Many courts, including this one, have noted that in light of *Reibor* a continuous service provision is necessary, in practice, to allow attachment of EFTs. That is no doubt true. But *Reibor* provides the proper response to this concern: the New York "rule works, to be sure, to the detriment of an attaching creditor, but that is simply the way the law was intended to operate."[39]

Many courts have also expressed concern that in the absence of a continuing service provision, plaintiffs will post process servers at bank offices around the clock in an attempt to capture EFTs at the precise moment of their arrival. I agree that this is likely and that this would be highly disruptive to New York banks. Accordingly, I decline to specially appoint any plaintiff-designated process servers. As a result, pursuant to Rule B(1)(d)(ii), I authorize only the United States Marshals to serve the process and any supplemental process.

Plaintiff expresses concern that this will impose an undue burden on the United States Marshals. Plaintiff's concern, though appreciated, is overstated: nothing requires the Marshals to repetitively serve the banks with attachment

---

[38]    Supplemental Rule B(1)(a).

[39]    *Reibor*, 759 F.2d at 268.

15

orders around the clock.  Further, plaintiff's duty to bear the costs of Marshal-served processes[40] will help limit the Marshals' workload.

## VI.    CONCLUSION

Plaintiff's application for a maritime attachment order is granted.

However, for the reasons stated above, plaintiff's request for continuous service

and a specially appointed process server are denied.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              February 4, 2009

---

[40]      *See* 28 U.S.C. § 1921 (providing that U.S. Marshals shall collect fees
for serving process in any proceeding).

## -Appearance-

**Counsel for Plaintiff:**

Garth S. Wolfson, Esq.
Mahoney & Keane, LLP
11 Hanover Square, 10th Floor
New York, NY 10005
(212) 385-1422